## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | |
|---|---|
| SANYA VIRANI, | |
| Plaintiff, | Civil Action No. 2:24-cv-1150 |
| vs. | |
| NLV FINANCIAL CORPORATION, NATIONAL LIFE INSURANCE COMPANY AND LIFE INSURANCE COMPANY OF THE SOUTHWEST, | CLASS ACTION |
| Defendants. | |

## <u>PLAINTIFF'S CLASS ACTION COMPLAINT</u>

Plaintiff Sanya Virani ("Plaintiff" or "Virani") individually and on behalf of all others similarly situated, for her Class Action Complaint against Defendants NLV Financial Corporation ("NLV"), National Life Insurance Company ("NLIC") and the Life Insurance Company of the Southwest ("LICS") (collectively, "Defendants"), states and alleges as follows:

## <u>INTRODUCTION</u>

1.     This is a class action on behalf of those who purchased from Defendant an Indexed Universal Life ("IUL") insurance policy (the "Policy" or "Policies"). Plaintiff brings this action to address Defendants' breaches of contract and their racketeering through the use and control of an enterprise of marketing entities that duped consumers by providing them with Defendants' materially misleading representations and omissions in connection with the sale of such Policies.

2.     Each Policy charges an annual premium that is supposed to cover the cost of providing insurance benefits and accumulated insurance value. Each Policy's "Accumulated Value" is the total of the premium paid (minus authorized deductions) plus returns credited from among various crediting options selected by the policyholder. The Accumulated Value is supposed

1

to eventually grow large enough (and continue to increase in value) to cover the ongoing annual premium and provide the policyholder with the lifetime income benefit for which the Policy was purchased.

3.     Each policyholder may allocate the Accumulated Value into various "Interest Crediting Strategies." Accordingly, a policyholder's selection of Interest Crediting Strategy is central to the benefits he or she is ultimately able to derive from the Policy.

4.     The Interest Crediting Strategies available for the allocation of Accumulated Value under the Policies included two proprietary synthetic Indexed Strategies: (1) the US Pacesetter Index; and, (2) the Balanced Trend Index. The Policies and accompanying Policy Illustrations provided detailed descriptions of and promises concerning these two indices.

5.     However, as detailed below, the US Pacesetter and the Balanced Trend Indices that Defendants offered were not what was promised, thus breaching the Policies. For example, the Policies promised Indexed Strategies with twenty years of historical performance when, in fact, these two indices were in existence for only a fraction of that time.  The Policies also promised in describing the history of the indices that if there was no index value for a calendar year, then the "most recent previous index value" was used, but it was not.  Moreover, rather than a twenty-year historical trend, the manufactured, misleading performance was based on a highly speculative back-cast model such that these indices had less than a *1 in 1,000* chance of performing consistent with the misleading "historical" performance. The promised "historical" performance was, in fact, a fraudulent sales trick. Defendants made these fraudulent representations and material omissions concerning the nature, returns and risk of these Indexed Strategies.

6.     Because of Defendants' wrongful conduct, Plaintiff and class members have and will continue to earn less money to cover future premium obligations, receive as income benefits,

or withdraw in a cash surrender. Moreover, due to onerous surrender charges, Plaintiff and the class members are practically "locked in" and would lose tens of thousands (or more) in premium payments if they discontinued their Policies. Accordingly, Defendants have caused material harm to Plaintiff and the proposed class members.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the claims asserted herein individually and on behalf of the Class pursuant to 28 U.S.C. §1332, as amended in 2005 by the Class Action Fairness Act. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; and (2) a substantial number of the members of the proposed class are citizens of a state different from that of Defendant. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including RICO, and pursuant to 18 U.S.C. § 1964, providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiff's causes of action occurred in this District in that it is the headquarters of NLV and NLIC, upon information and belief, the substantive underwriting of the Policies occurred in this District.

## PARTIES

9.      Plaintiff Sanya Virani is a citizen and resident of Fortville, Indiana.

10.     Defendant NLV is a Delaware corporation with its principal place of business in Montpelier, Vermont. NLV does business through the trade name National Life Group.

3

11.     Defendant NLIC is a Delaware corporation. It is 100% owned by Defendant NLV and also has its principal place of business in Montpelier, Vermont.

12.     Defendant LICS is a Delaware corporation. It is 100% owned by Defendant NLIC. Its principal place of business is claimed to be in Addison, Texas. However, LICS' mailing address is One National Life Drive, Montpelier, Vermont 05604. Moreover, according to LICS' Annual Statement for the Year 2023, LICS and its parent "share common facilities and employees." According to NLV's 2023 Annual Report, "NLIC and LSW operate as a unified organization."

13.     NLV issues IUL Policies under the product names SummitLife, PeakLife and FlexLife. NLV underwrites these Policies through "paper" insurance companies. In this case, NLV issued a SummitLife Policy to Plaintiff through Defendant LICS.  Defendants are hereinafter collectively referenced as "National Life" or "Defendants."

## FACTUAL BACKGROUND

### A. *The Sales Process*

14.     Defendants partner with independent marketing organizations ("IMOs") to market the Policies. IMOs recruit broker general agencies ("BGAs") who provide back-office support for independent agents. The independent agents, in turn, sell Policies to policyholders like Plaintiff. The IMOs, BGAs, and independent agents are non-Defendant RICO enterprise members, and are collectively referred to as "Sales Channel Persons" herein.

15.     On June 2, 2023, Plaintiff opened communications with Defendants' agent concerning purchasing a life insurance policy.

16.     Plaintiff and Defendants over the next several months engaged in several rounds of meetings, correspondence, and communications.

17.    On or about September 9, 2023, National Life Group sent to Plaintiff at her home a letter enclosing a National Life Insurance Illustration dated September 8, 2023 ("Illustration"); an Indexed Universal Life Buyer's Guide ("Guide") used by National Life Group to sell products issued by LICS (as a member of the National Life Group); the Policy itself; and the life insurance application completed by Plaintiff.

18.    At each step in the chain, Defendants strictly require the Sales Channel Persons to use the National Life Policy and Illustration created and provided by Defendants and prohibit the Sales Channel Persons from creating their own marketing materials or illustrations relating to the Policies.

### B.  *The Policy*

19.    Policy number LS1539788 was issued to Plaintiff. The Policy is an indexed universal life ("IUL") insurance policy, and Plaintiff is the Owner of the Policy. The effective date of the Policy is September 8, 2023.

20.    The face or base coverage amount of the Policy is $2,767,336.

21.    Pursuant to the Policy, Plaintiff is required to pay and did pay certain Planned Periodic Premiums (defined in the Policy as the premiums the policyholder has chosen to pay on an annual, semi-annual, quarterly or monthly basis, subject to a contractual minimum and maximum).

22.    Premiums paid are reduced by a Percent of Premium Expense Charge, which is 6%. Therefore, the Net Premium paid is 94% of any Premium payment.

23.    The Policy also has a monthly deduction, which includes the Monthly Cost of Insurance, the Monthly Expense Charge, the Monthly Policy Fee, the Monthly Accumulated Value Charge and the monthly cost of any riders (together, the "Policy Expenses").

24. The ongoing monthly Accumulated Value of the Policy is the Net Premium plus the sum of any returns from any Interest Crediting Strategies (discussed below) minus the Policy Expenses.

25. Owners like Plaintiff are required to apportion the Accumulated Value among various Interest Crediting Strategies offered by Defendants, including "Fixed-Term Strategies" and "Indexed Strategies" – the returns from which are credited to the Policy's Accumulated Value.

26. Where a participant selects an Indexed Strategy, certain additional terms are relevant.

> (a) The "Participation Rate" is the percentage of the annual increase in the Indexed Strategy that is credited to the Accumulated Value. For example, a 200% Participation Rate means that the Accumulated Value is supposed to increase at double the increase reflected in the selected Indexed Strategy.

> (b) The "Cap Rate" is an upper limit on the amount of returns that are credited from any gains in an Indexed Strategy. For example, a 10% Cap Rate means that no Index Strategy gains above 10% are credited to the Accumulated Value.

> (c) A "Floor Rate" is a lower limit on the amount of returns that are credited from an index's gains or losses. For example, a 0% Floor Rate means that no Index Strategy losses are credited to the Accumulated Value.

### C. *The Illustration*

27. Plaintiff received from Defendants a SummitLife Indexed Universal Life Policy Illustration.

28.    As required by Actuarial Guideline AG-49A, the Illustration projects a future Accumulated Value prior to the deduction of any Policy Expenses using the Benchmark Indexed Account rate as a crediting rate. [1]

29.    At the time of the Illustration, the Benchmark Indexed Account rate was 6.42%. The Illustration projects the Accumulated Value, Cash Surrender Value and Death Benefit under the Policy after application of the 6.42% crediting rate to and deduction of Policy Expenses from the Accumulated Value.

30.    Before Plaintiff purchased the Policy, Defendants required Plaintiff, as Defendants required all Policy purchasers, to sign an acknowledgement that: "I have received a copy of this illustration and understand that any non-guaranteed elements illustrated are subject to change and could be either higher or lower."

31.    Defendants also required their agent who sold Plaintiff her Policy, as Defendants required all their sales agents on all Policy sales, to: "certify that this illustration has been presented to the applicant," that "I have explained that any non-guaranteed elements illustrated are subject to change," and that "I have made no statements that are inconsistent with the illustration."

32.    Accordingly, part of Defendants' required sales process is verification that customers, including Plaintiff and the members of the Class, have received and reviewed the Illustration and were not provided with any information inconsistent with the Illustration.

---

[1] The Benchmark rate is based on the returns of the S&P 500 index with a 100% participation rate, a 10.25% cap rate and a 0% floor rate, which means that any increase in the S&P 500 index results in a maximum crediting rate of 10.25% and any decrease in the S&P 500 results in zero crediting.

### D.  *The Indexed Crediting Strategies*

33.    The Indexed Strategies are engineered indices. The are comprised of notional assets. In other words, they do not own any stocks, bonds or other assets. The indices cannot be invested in because there is nothing in which to invest. The indices simply track the returns of underlying assets. They are used by Defendants to calculate the amount to credit to the Policy Accumulated Value.

34.    Defendants license the Indexed Strategies offered under the Policies from those indices' creators for use in the life insurance products offered and sold by Defendants' the Policies. For Plaintiff, these entities are: SG Americas Securities LLC and Credit Suisse. Defendants then sell the Indexed Strategies directly to consumers as part of the Policies. Neither SG Americas Securities LLC nor Credit Suisse have any relationship (contractual or otherwise) under the Policies with Plaintiff or other members of the Class.

35.    Defendants are solely responsible for the contents of all Policy and Illustration documents concerning the Indexed Strategies used in connection with the sale of the Policies.

36.    The Policies include, among the available Indexed Strategies, two relevant crediting strategies. The first is the Credit Suisse No Cap Annual Point-to-Point Indexed Strategy. The Policy has a specific Rider describing this Strategy which provides that the Index is the Credit Suisse Balanced Trend Index. The Illustration describes the Balanced Trend Index offered under the Policy as follows:

> The Index has a 0.5% per annum embedded fee deducted on a daily basis. The index fee will place a drag on the performance of the index, offsetting any appreciation of its portfolio, exacerbating any depreciation of its portfolio and causing the level of the index to decline steadily if the value of its portfolio remains relatively constant.

It further states that the Balanced Trend Index "***is an excess return index***, which means that it reflects the return of components net of the cost of funding a hypothetical investment in them. The Index returns are likely to be negatively affected by the cost of funding."[2] (Emphasis added.)

37.    The second is the US Pacesetter No Cap Annual Point-to-Point Indexed Strategy. The Policy has a specific Rider describing this Strategy which provides that the Index refers to the Societe Generale ("SG") US Pacesetter Index. The Illustration describes the US Pacesetter Index offered under the Policy:

> In calculating the performance of the Index, SG deducts a maintenance fee of 0.50% per annum on the level of the Index, and fixed transaction and replication costs, each calculated on a daily basis. The transaction and replication costs cover, among other things, rebalancing and replication costs. The total amount of transaction and replication costs is not predictable and will depend on a number of factors, including the leverage of the Index, which may be as high as 200%, the performance of the components underlying the Index, market conditions and the changes in the market environments, among other factors. The transaction and replication costs, which are increased by the Index's leverage, and the maintenance fee will reduce the potential positive change in the Index and increase the potential negative change in the Index. While the volatility control applied by the Index may result in less fluctuation in rates of return as compared to indices without volatility controls, it may also reduce the overall rate of return as compared to products not subject to volatility controls.

Unlike the Balanced Trend Index, the Illustration does ***not*** disclose that the US Pacesetter Index is also an "excess" return index.

38.    The Balanced Trend Index and US Pacesetter Index Policy Riders set forth a minimum Participation Rate. Under the Policy, the minimum Participation Rate is 50% for each Index, which means that no less than 50% of the net annual increase in the Index will be credited to the Accumulated Value. However, as discussed below, that Participation Rate has very different implications for an "excess return" fund.

---

[2] The cost of funding is currently tied to the Federal Reserve Secured Overnight Funding Rate. It was previously tied to the 3-month U.S. dollar London Interbank Offered Rate.

39.    The Illustration also contains *additional* information describing the Indexed Strategies that was *not* required by the Policy.

40.    In particular, the Illustration has a chart ("Chart") of two sets of "historical rates" for the Balanced Trend Index and US Pacesetter Index Indices.

41.    The first set of "historical" rates are rates for each of the indices themselves. These rates do not incorporate a Floor, Cap Rate or Participation Rate.

42.    The second set of "historical" rates show rates that are credited under the Policies with a 0% Floor, no cap and a high Participation Rate.

43.    The Illustration represents with respect that "[t]he *historical rates* shown below are determined by applying the current Cap, Participation and Floor Rates to the most recent 20 *full* calendar years of *historical* index performance" (emphasis added). It further states that the "*historical performance* of the S&P 500 Index, Credit Suisse Balanced Trend Index and US Pacesetter Index should not be considered a representation of past or future performance of any of the Indexed Strategies available *in this policy*...." (emphasis added).

44.    The Illustration represents that the historical rates in the Chart:

...do not represent the actual interest that would have been credited *because the Cap Rate and Participation Rate would have changed over time* and actual results would have been different. There is an expense charge, policy fee, cost of insurance and other policy charges associated with the SummitLife UL policy. The historical returns by strategy do not reflect these policy charges. (emphasis added.

45.    In fact, even excluding changes in the Cap and Participation Rates which were solely a function Defendants' operation of the Policies, the reported "historical performance" allegedly describing the Balanced Trend Index and the US Pacesetter Index offered under the Policy was an artificial construct and, fundamentally, a fraudulent sham.

###### i.    *The Claimed Balanced Trend Index Return*

46.    According to the Chart, the Balanced Trend Index has a Policy crediting rate based on a Participation Rate of 200%, with a 0% Floor Rate and no cap, which means that the Policy credits interest in an amount that is double the represented "historical" performance of the Balanced Trend Index without accounting for any losses in the Balanced Trend Index.

47.    Because losses are not included in the crediting rate and not deducted from returns, the represented return is more than double the represented "historical" return of the underlying Balanced Trend Index. For example, the Chart represents that the 5-year average return for the Balanced Trend Index is only 0.60 %, whereas the 5-year average crediting rate for the Policy is 6.67%. The Chart represents that the 10-year average return for the Balanced Trend Index is only 3.5 %, whereas the 10-year average crediting rate for the Policy is 9.75%. The Chart represents that the 15-year average return for the Balanced Trend Index is only 4%, whereas the 15-year average crediting rate for the Policy is 9.93 %. The Chart represents that the 20-year average return for the Balanced Trend Index is only 4.50 %, whereas the 5-year average crediting rate for the Policy is 10.46%.

###### ii.    *The Claimed US Pacesetter Index Return*

48.    According to the Chart, the US Pacesetter Index has a Policy crediting rate based on a Participation Rate in the US Pacesetter Index of 215% with a 0% Floor Rate and no cap, which means that the Policy credits interest in an amount that is more than double the represented "historical" performance of the US Pacesetter Index without accounting for any losses in the US Pacesetter Index.

49.    Because losses are not included in the crediting rate and are not deducted from returns, the represented return is more than double the represented "historical" return of the

11

underlying US Pacesetter Index. For example, the Chart represents that the 5-year average return for the US Pacesetter Index is only 2.5%, whereas the 5-year average crediting rate for the Policy is 12.53%. The Chart represents that the 10-year average return for the US Pacesetter Index is only 3.5%, whereas the 10-year average crediting rate for the Policy is 11.12%. The Chart represents that the 15-year average return for the US Pacesetter Index is only 4.8%, whereas the 15-year average crediting rate for the Policy is 12.75%. The Chart represents that the 20-year average return for the US Pacesetter Index is only 5.9%, whereas the 5-year average crediting rate for the Policy is 14.57%.

* * *

50.     As alleged above, the crediting rates for the Balanced Trend and US Pacesetter Indices in the Chart cannot be used as the crediting rate in the Illustration because the illustrated crediting rate under Actuarial Guideline AG-49A is the **_lesser of_** the rate from the applicable crediting strategy and the Benchmark Indexed Account crediting rate which, as alleged above, was 6.42%. Because the represented Balanced Trend and US Pacesetter Index crediting rates are far above 6.42%, the lesser value of 6.42% must be and is the illustrated crediting rate that should have been applied to the Policies. Therefore, the represented crediting rates for the Balanced Trend and US Pacesetter Indices are **_not_** part of the required Illustration and serve no purpose in the Illustration. Instead, they are designed to suggest that the indices with excessive crediting rates existed for twenty years with historical success during that time, which, as alleged below, they did not.

### E. *Defendants' Misleading Description of the Indices*

#### i. *Defendants' Misleading Description of the US Pacesetter Index as a Total Return Fund*

51.     The Illustration does not describe the investment profile or asset allocation of the US Pacesetter Index. But, in a marketing guide that Defendants prepared with the intent of having the Sales Channel Persons provide the guide to consumers, Defendants represented that the returns from the Index are from a mix of the returns from U.S. equities, U.S. government debt and commodities within the agriculture, metals and energy sectors net of Index expenses as alleged above.

52.     But, according to an April, 2024 Societe Generale brochure for the US Pacesetter Index (the "Brochure"), the US Pacesetter Index is an "excess return" index that excludes additional returns from the asset sectors in the US Pacesetter Index. The Brochure states:

> The Index is an "excess return" index and not a "total return" index. In general, returns from investing in futures contracts are derived from three sources: (1) changes in the price of such futures contracts (known as the price return), (2) profit or loss realized when rolling from a futures contract with one expiry date to another futures contract with a different, generally later, expiry date (known as the "roll return") and (3) interest earned on the cash (or other) collateral deposited in connection with the purchases of such a future contract (known as the ***"collateral return."***) The component sub-indicies of the Index (the "Index Components") generate "excess return," meaning the sum of the price return and roll return with respect to the Index Components. As a result, an investment in an instrument linked to the Index will not generate the same returns that would be obtained from investing directly in future contracts underlying the Index components because the collateral return is not used in calculating an excess return index.

(Emphasis added.)

53.     Funds to collateralize futures contract purchases are typically deposited in an account that invests in short-term fixed income instruments such as 3-month Treasuries. When Plaintiff bought the Policy, the 3-month Treasury rate was approximately 5.5%. Accordingly, the

US Pacesetter Index *had to earn over 5% just to "break even,"* before the deduction of the expenses alleged above (the "Break Even Rate").

54.    By excluding the collateral return, the Index excludes from its returns a material component of the returns generated from a futures contract investment strategy – the returns generated by the investment of the funds that must be deposited as collateral for the purchase of futures contracts. The exclusion of the collateral return is effectively a massive undisclosed "fee."

55.    As a result, US Pacesetter Index returns were not calculated or credited in accordance with the terms of the Policy.

56.    Defendants misleadingly stated that the US Pacesetter Index returns are from a mix of the returns from U.S. equities, U.S. government debt and commodities while failing to disclose that the US Pacesetter Index returns were limited to the excess above the collateral return.

57.    Moreover, Defendants failed to disclose any projection of the amount of the collateral return, or even how that return is calculated.

### ii.    Defendants' Misleading Description of the US Pacesetter Index "Historical" Returns and Crediting Rates

58.    As alleged above, the Illustration states that the US Pacesetter Index returns and the US Pacesetter Index crediting rates were based on historical information.

59.    In fact, the US Pacesetter Index returns and crediting rates in the Chart, which states that it includes returns for *twenty* years, were not based on historical information for the simple reason that the US Pacesetter Index *did not exist* prior to December 10, 2021. Consequently, at most, less than *two years* of returns could have been based on historical information.

60.    According to the Societe Generale Brochure:

The Index was launched on 12/10/21. Therefore, all data for the Index prior to launch date represents the application of the Index methodology by Societe Generale in order to reconstruct hypothetical historical data. The back-tested,

hypothetical, historical data has inherent limitations and is provided for illustrative purposes only. Results during these periods may have been different (perhaps considerably) had the Index actually been in existence. Unlike actual performance records, hypothetical or simulated performances, returns or scenarios may not necessarily reflect certain market factors such as liquidity constraints.

61.     Because the Illustration promised that the US Pacesetter Index returns and crediting rates were based on historical information, excluding changes in the Cap and Participation Rates, the promises in the Illustration were fraudulent and misleading.

62.     The Illustration also promised that: "If no index value was published on the beginning and end dates of the calendar year, then the most recent previous index value was used to determine the historical rate." Defendants breached this promise for the years that the index did not exist.

### iii. Defendants' Misleading Description of the Balanced Trend Index "Historical" Returns and Crediting Rates

63.     As alleged above, the Chart states that the Balanced Trend Index returns and the Balanced Trend Index crediting rates were based on historical information.

64.     In fact, the Balanced Trend Index returns and crediting rates in the Chart, which states that it includes returns for *twenty* years, were *not* based on historical information for the simple reason that the Index *did not exist* prior to November 20, 2017. Consequently, at most, less than *six years* of returns could have been based on historical information.

65.     Because the Illustration promised that the Balanced Trend Index returns and crediting rates were based on historical information, excluding changes in the Cap and Participation Rates, the promises in the Illustration were fraudulent and misleading.

66.     The Illustration also promised that: "If no index value was published on the beginning and end dates of the calendar year, then the most recent previous index value was used

to determine the historical rate." Defendants breached this promise for the years that the index did not exist.

### iv. Defendants' Purported Disclaimers Concerning the Balanced Trend Index Do Not Mitigate Their Breaches and Fraud

67.    Buried in the last page of the Illustration, "fine print" purports to describe the Balanced Trend Index, but ***not*** the US Pacesetter Index, which is facially inconsistent and irreconcilable with itself and with the remainder of the Illustration. The "fine print" states that:

> No actual investment which allowed the tracking of the performance of the Index was possible before 11/20/2017. The return results provided herein are illustrative only and were derived by means of a retroactive application of a back-casted model designed with the benefit of hindsight. These back-casted, hypothetical, ***historical annualized index returns*** have inherent limitations. No representation is made that in the future the Index will have the returns shown. Alternative modeling techniques or assumptions might produce significantly different results and may prove to be more appropriate. Actual annualized returns may vary materially from this analysis. Any effective volatility controls may reduce the overall rate of return. (emphasis added)

68.    Like the main body of the Illustration, the "fine print" states that Balanced Trend Index returns were based on "***historical*** annualized index returns." Due to its reaffirmation that index's returns are "historical," the "fine print's" inconsistent and irreconcilable reference to a "back-casted model" does nothing to mitigate the fraudulent statements in the Illustration.

### v. The Represented Index Returns Were Deceptive and Misleading

69.    In addition to the fact that the returns from the US Pacesetter and Balanced Trend Indices were not historical, the "historical" returns were also deceptive and materially misleading because the returns alleged above had no realistic chance of ever being attained and their inclusion was part of the fraudulent artifice. Instead, these returns were based on "cherry-picked" back-casted data which resulted in returns that had, for example, a less than a ***1 in 1,000*** chance of success.

### a. **The Recognized Potential of Back-Casted Returns to Mislead**

70.     Regulators and regulatory bodies, including the National Association of Insurance Commissioners (the "NAIC"), have recognized the potentially misleading nature of back-casted proprietary indices used to illustrate or promote annuities. For example, the following Bulletin issued by the Iowa Insurance Commissioner to insurance companies issuing annuities in Iowa highlights the abuses associated with the Policies:

> Similarly, some marketing materials depict charts of recently developed "proprietary indices," which did not exist during the illustrated time frame, but are back-casted and hypothetically demonstrate how they would have outperformed traditional indices. … Using these hypothetical performance charts is misleading if they, directly, or indirectly through subsequent representations by producers, are used to project future performance and contribute to inflated consumer expectations.

"Bulletin 14-02" issued September 15, ,2014 (emphasis added).

71.     Similar concerns about the use of back-casted proprietary indices in sales illustrations and marketing materials were voiced by New York Life, MetLife and Northwestern Mutual in submissions to the NAIC:

> [M]any market participants utilize the practice of calculating hypothetical historical returns. These hypothetical look back calculations take into account the past performance of the underlying index, but not interest rates, volatility or option prices, which are drivers of the non-guaranteed elements. In certain economic environments, the hypothetical look back approach may allow maximum illustrated rates that are not appropriate for general account life insurance policies and, if used improperly, could be misleading to purchasers….

Statement to NAIC on "Actuarial Guidelines on IUL Illustrations" dated September 5, 2014.

72.     Finance experts have acknowledged the actual and potential abuses stemming from backcasted projections resulting from the selection of unrepresentative benchmark time periods, overfitting, data mining, volatility filters and similar assumptions. *See e.g.,* O. Safarti, "Backtesting: A Practitioner's Guide to Assessing Strategies and Avoiding Pitfalls," CBOE 2015 Risk Management Conference.

73.     According to an article entitled "Engineered Indices and FIA," engineered indices "have come to play an increasingly pivotal role in how Indexed UL products are illustrated and sold." According to the article, "[t]he fundamental problem with this hypothetical lookback methodology is that it can be easily gamed because the data is already known. All you have to do to optimize and index or a crediting strategy is to back-fit the data if you want to increase the illustrated performance." [3]

**b.  <u>Defendants' Represented Returns Were Particularly Egregious</u>**

74.     Defendants made deceptive and materially misleading representations about the returns of the Indices.

75.     For example, the US Pacesetter Index is a notional index, meaning it does not hold any assets. It simply tracks the performance of three proprietary Societe Generale sub-indices: an SG equity index, an SG bond index, and an SG commodity index.

76.     The sub-indices likewise do not own any assets. Instead, they track the performance of underlying assets. Specifically, the equity sub-index tracks the performance of the S&P 500 Index, the bond sub-index tracks the performance of 10-year US Bonds, and the commodity sub-index tracks the performance of a Commodity Long/Short index and has exposure to the agriculture, energy and metals sectors.

77.     Defendants do not buy shares or otherwise invest directly in any index or sub-index. Instead, they purchase the futures contracts underlying the sub-indices and allocate any gains net

---

[3] This article was included in materials for the fall meeting of the National Association of Insurance Commissioners at pdf page 47-48. https://content.naic.org/sites/default/files/national_meeting/A_Cmte_Materials%2012-1-23.pdf

of the US Pacesetter Index expenses alleged above, if any, to the Accumulated Cash Value of the Policy as provided in the Policy.

78.    The US Pacesetter Index is allocated to one of three portfolios of these sub-indices. The "Risk-On" or "Growth" portfolio is allocated 50% in the equity sub-index, 30% in the bond sub-index, and 20% in the commodity sub-index. The "Intermediate" or "Transitional" portfolio is allocated 15% in the equity sub-index, 65% in the bond sub-index, and 20% in the commodity sub-index. The "Risk-Reduced" or "Shrinking" portfolio is allocated 5% in the equity sub-index, 75% in the bond sub-index, and 20% in the commodity sub-index.

79.    The US Pacesetter Index portfolio may change monthly through what is known as an Asset Rotation that is directed by a Societe Generale algorithm.

80.    During the first five trading days of a month, the algorithm determines the portfolio for the coming month. If the algorithm changes the portfolio, then on trading days 6-10, the Asset Rotation occurs and Defendants buy and sell underlying futures contracts to rebalance the assets in the selected portfolio.

81.    Additionally, volatility control is imposed daily through infusions or withdrawals of cash. If the market is moving rapidly up or down by more than 5%, then cash is infused. Since the cash generally earns a nominal, positive return, the impact of the cash infusion is to dilute and "water down" the positive or negative returns for the portfolio. When volatility subsequently decreases, then cash is withdrawn, and the relevant index earns a greater percentage of the gains and losses from the underlying portfolio. In periods of high volatility, exposure to the underlying assets tracked by the relevant index could be reduced to 50%. In periods of low volatility, exposure to the underlying assets tracked by the relevant index could be as much as doubled.

82.    If volatility control is imposed and cash dilutes the positive returns of the portfolio during a period of rapid market price increases, the US Pacesetter Index does not take advantage of all of these significant market increases, thereby making high returns harder to obtain.

83.    As alleged above, the US Pacesetter Index commenced on December 11, 2021. Societe Generale has published actual data concerning the operation and performance of the US Pacesetter Index from that date, including the actual allocations to a particular portfolio in the US Pacesetter Index since December 11, 2021 and how the allocations were made.

84.    Since December 11, 2021, the actual returns of the US Pacesetter Index have been consistently down (i.e., negative numbers).

85.    If the Index Asset Rotation algorithm was an "average performing investor" and neither outperformed nor underperformed the market, one would expect that the Index would have selected the best, worst and middle performing portfolio one-third of the time each. Instead, the US Pacesetter Index selected the worst performing portfolio *41%* of the time. In other words, the US Pacesetter Index underperformed returns that could be achieved by "throwing darts" at a dartboard.

86.    Societe Generale also publishes data showing the results of a back-cast model showing the hypothetical returns of the US Pacesetter Index, after deduction of the collateral return and expenses as alleged above, from 2002 to the December 11, 2021 inception date. While actual returns for the US Pacesetter Index were consistently down, the back cast model represents that the hypothetical returns were consistently up.

## SIMULATED & HISTORICAL PERFORMANCE



87.    In other words, the returns from the hypothetical back-cast model are shown to be dramatically better than the actual returns since the inception of the US Pacesetter Index.[4]

88.    Societe Generale also publishes the historical performance data of the three underlying sub-indices that comprise the Index portfolios during the period of the hypothetical back cast results.

89.    Based on (1) publicly available data on the US Pacesetter Index since December 11, 2021, including the actual allocation to a particular portfolio and the data demonstrating how the allocation was made, (2) the historical performance data of the three underlying sub-indices,

---

[4] As alleged above, the Chart (dated September 9, 2023) represents that the 5-year average annualized return for the US Pacesetter Index is 2.5%, the 10-year average return is 3.5%, and the 20-year average return (since 2003) is 5.9%. The Brochure (dated April, 2024) states that the 5-year average annualized return is 2.10%, the 10-year average return is 3.89 %, and the 20-year average return (since 2003) is 5.59%. While these returns differ modestly, the differences may be attributed to the differing time periods being measured.

and, (3) the back-cast model data, Plaintiff has been able to understand and, upon information and belief, approximate the most likely portfolio allocation underlying the back-cast hypothetical returns during the back-cast period.

90.    It is highly unlikely that random chance alone can explain the dramatically greater returns during the back-cast period compared to the actual poorer returns after December 11, 2021. For example, as alleged above, the US Pacesetter Index selected the worst portfolio 41% of the time while, during the back-cast period, it selected the worst portfolio only 14% of the time.

91.    Statistical analysis demonstrates that the differences in the actual and back-cast returns are statistically significant. Indeed, the chances that the back-cast returns occurred by random chance are *less than 1 in 1,000*.

92.    Societe Generale has disclosed that the back-cast returns are highly speculative. The Brochure states:

> This back-tested, hypothetical, historical data has inherent limitations and is provided for illustrative purposes only. Results during these periods may have been different (perhaps considerably) had the Index actually been in existence.

93.    The Policy and Illustration, in sharp contrast, only represent that the hypothetical returns on the Chart are based on "historical" information, as alleged above.

94.    The crediting rates, as opposed to the Index returns, on the Chart are particularly egregious because the Chart crediting rates are based on a 0% Floor Rate and a 215% Participation Rate.

95.    To achieve a 215% Participation Rate, Defendants would have to buy more than twice as many futures contracts than if they were crediting returns based on the performance of US Pacesetter Index alone. Those contracts have a cost, and the expense associated with these

additional contracts would be a further reduction in the returns credited under the Policy from the US Pacesetter Index.

96.    Moreover, a 0% Floor Rate is essentially insurance against any loss. To provide that insurance, Defendants must buy options to hedge against the prospect that the value of the futures contracts that are designed to replicate the US Pacesetter Index do not fall in value. These options have a cost, and the expense associated with these hedge options would result in a further reduction of the returns credited under the Policy from the US Pacesetter Index.

97.    As a result of these additional costs, the crediting rates shown on the Chart are even more improbable than the back-cast Index returns.

98.    According to an article in InsuranceNewsNet Magazine,[5] since its inception, the US Pacesetter Index is down 13.69% whereas over the same period, the S & P 500 is up 1.23%.

99.    The Balanced Trend Index returns and crediting rates are similarly improbable. For example, like the US Pacesetter Index, the Balanced Trend Index credited returns would be reduced by the undisclosed expenses resulting from the cost of the additional options necessary to attempt to achieve a 200% Participation Rate or provide for the insurance of a 0% Floor Rate. As alleged above, the Chart only shows the benefit of a 200% Participation Rate and a 0% Floor Rate without accounting for the cost of that enhanced participation rate and floor.

100.    According to the InsuranceNewsNet Magazine article, since inception, the Balanced Trend Index is up only 7.7% whereas the S & P 500 is up 84.72%. The article further stated:

> To begin, we will highlight the Credit Suisse Balanced Trend 5% Index (Balanced Trend Index) due to its age relative to other popular VCIs and its performance's

---

[5] https://insurancenewsnet.com/innarticle/the-real-cost-of-volatility-controlled-indices-in-iul-policies

proximity to the average of the group. The Credit Suisse Balanced Trend 5% Index went live on Nov. 20, 2017. Due to their reliance on low volatility, VCI-linked index strategies are often uncapped and feature high participation rates or other crediting bonuses to offset their lower expected returns. For that reason, one would reasonably expect to see worse raw index performance than the S&P 500 but close enough that these bonuses make up the difference.

With the current bonuses on the actively placed IUL featuring the Balanced Trend Index, it only needs to average approximately 40% of the S&P 500's growth to produce a similar return to investors.  This is uncapped growth, 0% floor, 210% participation rate and 0.4% fixed bonus, according to data obtained from National Life Group life insurance illustration software.

In backcasted data, the balanced trend index produced 6% annual returns compared with 7.6% for the S&P 500, or 78% of the S&P 500's return from Sept. 30, 2002, to Nov. 20, 2017 — well over the 40% needed to justify using the VCI. However, since the Balanced Trend Index went live, its growth was only 9.1% of the S&P 500's, as shown above.

In other words, while backcasted data suggested that an IUL based on the Balanced Trend Index would outperform one backed by the S&P 500, real-world data has suggested the opposite. This result of poor performance compared with the S&P 500 is consistent across all 12 VCIs analyzed.

### vi.  *Defendants' Misleading Description of the Volatility Control*

101.    As alleged above, volatility control dampens the effects of rapid market moves. Accordingly, with volatility control, an Index may rise less in a rapidly rising market but fall less in a rapidly falling market.

102.    But, the Illustration provides no information concerning how the volatility control is determined or the factors relating thereto. Therefore, Plaintiff could not evaluate how volatility control might reduce the performance of the Indices in the future which, as alleged below, occurred.

### vii.  Summary

103.    To be clear, this action centers on that supposed "historical" Index returns and Policy crediting rates were available under the Policies.  In reality, they did not exist and could never realistically exist.

104.    This case does not center on any particular annual return or crediting rate set forth in the Illustration Defendants required their Sales Channel Persons to provide to consumers.

105.    Even if Defendants' purported disclaimers denying that the crediting rates, ***but not the Index returns***, "should not be considered a representation of past or future performance for any of the Indexed Strategies ***in the Policy***" [6] might be designed to protect Defendants from a specific challenge to the illustrated crediting returns, which Plaintiff does not concede, the disclaimers in no way protect Defendants from this claim that the Indices and their Illustrations are fundamentally a false promise and fraudulent sales scheme.  Indeed, if "***historical***" Illustrations have no value as a "representation of ***past*** or future performance" of crediting rates, it is logical to question why they are provided to consumers

### F.  *Plaintiff Has Been Harmed By Defendants' Misleading Descriptions*

106.    Plaintiff allocated 100% of the Accumulated Value under her Policy to the US Pacesetter Index.

107.    According to her 2024 Annual Statement issued by National Life, ***0%*** interest was credited to her account as a result of that allocation for the period September 22, 2023, to September 21, 2024.

---

[6] The disclaimer is quite precise to disclaim only performance for "Indexed Strategies in the Policy." The represented "historical" Index returns are not available "in the Policy." Only the Index crediting rates are.

108.    To date, Plaintiff has paid tens of thousands of dollars to Defendants in Policy premiums.

109.    The US Pacesetter Index has not performed as promised.

110.    Plaintiff may cancel and surrender the Policy and receive the Accumulated Value of the Policy only upon payment of the applicable Surrender Charge. However, the Surrender Charge is $49,618.33 in the first year of the Policy, gradually declining to $5,202.59 in the tenth year. (Beginning in the 11th year, there is no Surrender Charge.)

111.    Plaintiff stands to lose tens of thousands of dollars in Surrender Charges if she cancels and surrenders her Policy in the short term, largely or completely eliminating all of the Policy's Accumulated Value and resulting in a complete loss of the premiums she has already paid.

112.    Plaintiff has been damaged for the reasons set forth above.

## FEDERAL RICO ALLEGATIONS

113.    RICO provides a civil cause of action for private plaintiffs and authorizes substantial remedies, including the availability of treble damages and attorneys' fees. Establishing a RICO violation requires proof by a preponderance of the evidence of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985) (interpreting § 1964(c)).

### A.  *The Enterprise*

114.    Defendants, jointly and individually, are "persons" within the meaning of 18 U.S.C. § 1961(3). Plaintiffs and the other members of the Class defined below are each "persons" within the meaning of 18 U.S.C. §1961(3), and each of them has sustained injury to their business or property as a result of the acts and the conduct of Defendants and the Sales Channel Persons described herein.

26

115.    Defendants and the Sales Channel Persons (including the IMOs, BGAs and independent agents) associated in fact as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) to market and sell the fraudulent Policies. This association is fact is referred to herein as the "Enterprise." As alleged more fully in the following paragraphs, the Enterprise has an ascertainable and ongoing and continuous existence that is separate from the alleged pattern of racketeering activities and members who have existences and activities that are separate and distinct from those of the Enterprise.

**B.    _Ascertainable Structure and Control of Enterprise_**

116.    The Enterprise is an ongoing and continuing organization of entities associated for the common or shared purpose of selling the fraudulent Policies. Each member of the Enterprise has a clearly defined role in the fraudulent affairs of the Enterprise.

117.    The Enterprise is directed by Defendants, who (1) create the Policies, create and disseminate all Illustrations used to sell the Policies, (2) require that the Sales Channel Persons strictly comply with the fraudulent scheme concerning the sale of policies and (3) collect the proceeds of the Enterprise.

118.    The Sales Channel Persons market and sell the Policies throughout the United States as directed by Defendants.

119.    There is a hierarchical operating and decision-making structure governing the activities of the Enterprise:

- Defendants provide the Sales Channel Persons with and require the use of uniform misleading marketing materials, Illustrations and Policies—and prohibit the Sales Channel Persons from using any other marketing materials, Illustrations and Policies.

27

- Agents selling the Policies must sign a "National Life Field Contract" which requires that "Agent shall be familiar with and comply with all of National Life's … rules, regulations, systems, and instructions."

- The National Life Field Contract further mandates that "Agent agrees not to use or cause to be used any letters, advertising materials, or any other printed or electronic matter or promotion of any kind relating to National Life … unless first approved in writing by National Life."

- National Life's Compliance Manual requires, in bold, that "th[e] illustration must be signed and date by both you and the applicant / policyholder."

- Moreover, agents selling the Policies to customers must certify in writing that they have not told the customer anything inconsistent with the misleading Illustration or with the fraudulent scheme.

- The Sales Channel Persons receive commission payments from Defendants based upon how successful they are in selling the Policies based on Defendants' fraudulent materials.

120.    Defendants' fraudulent scheme to sell the Policies through the Sales Channel Persons has been wildly successful. SummitLife is the #1 selling IUL policy in the United States with a dominant market share. IUL is also the fastest growing segment of the life insurance market.[7]

121.    Defendants thus exercise substantial control over the direction of the Enterprise by, inter alia:

---

[7]*See*        https://www.nationallife.com/Our-Story/newsroom/Wink-Inc-ranks-National-Life-Group-1-in-indexed-life-sales-for-10-quarters-in-a-row   and   https://insurancenewsnet.com/innarticle/indexed-life-sales-break-records-in-fourth-quarter-wink-reports

- designing and issuing the fraudulent Policies offered for sale to consumers throughout the United States;

- designing and distributing fraudulent Illustrations describing the supposed features of the Policies, including the Indexed Strategies;

- developing uniform and fraudulent sales and marketing materials, standardized contracts, and Illustrations; and

- instructing and requiring Sales Channel Persons to use *only* standardized Illustrations sales materials that comprise the fraudulent scheme.

- Requiring Agents selling the Policies to certify in writing that they have not told the customer anything inconsistent with the misleading Illustration or with the fraudulent scheme.

122.    As a result of Defendants' scheme, the Policies are among the most widely sold and popular such products in the U.S.

## C. *Continuous Existence*

123.    The Enterprise has had an ongoing and continuous existence during the Class Period.

124.    Throughout the Class Period, the members of the Enterprise associated in fact to market and sell the Policies. Defendants developed, marketed and sold a continuous stream of Policies that were sold through the Sales Channel Persons.

125.    Likewise, the Sales Channel Persons sold Defendants' Policies to consumers on an ongoing basis each year during the Class Period, and they participated actively in the affairs of the Enterprise through their sales activities for the Policies.

126.    The Enterprise has displayed a continuity of membership during the Class Period. Defendants have acted continuously in their leadership role, while the Sales Channel Persons have provided services to the Enterprise throughout the Class Period, such that there has been a stable network of participants in the Enterprise year after year.

127.    On information and belief, the Enterprise continues to offer the Policies through the present day.

### D.  *Separate Existence*

128.    Each member of the Enterprise has an existence separate from the participation in the racketeering activities of the Enterprise.

129.    Defendants and each of the IMOs, BGAs and independent broker agents who comprise the Sales Channel Persons are all organized as separate corporations, entities or persons, with separate books and records, separate accounts, and separate existences for legal and regulatory purposes.

130.    The Enterprise also has an existence and structure that is separate and distinct from other affairs of its members. Members of the Enterprise engage in legitimate business operations separate and apart from their activities on behalf of the Enterprise. In addition to the Policies sold by the Enterprise, Defendants and the Sales Channel Persons market and sell many other insurance products.

131.    The involvement of separate corporations and entities in the Enterprise provides a separate, ascertainable structure to the Enterprise. In addition, because the members of the Enterprise perform activities on behalf of the association-in-fact that are separate from the alleged racketeering activities, including the sale of products other than the Policies, the Enterprise also has an existence separate from the alleged racketeering activities themselves. Also, because each

of the members of the Enterprise engages in separate lawful activities apart from their activities on behalf of the Enterprise, each of them has a separate existence that extends beyond the Enterprise and beyond the alleged racketeering activities themselves.

132.    However, because the members of the Enterprise engage in conduct on behalf of the Enterprise that are not lawful or regular business activities, the racketeering activities of the Enterprise are not simply the normal business activities of Defendants. For all of these reasons, the Enterprise has an ascertainable and continuing existence that is separate from the racketeering activities themselves and the alleged racketeering activities of the Enterprise are not co-extensive with the ordinary business of Defendants.

### E. *Interstate Commerce*

133.    The Enterprise functions, in part, by deceiving consumers nationwide concerning the nature and operation of the indices incorporated into the Policies sold through and on behalf of the Enterprise. Defendants and the Sales Channel Persons, through the Enterprise, have engaged in a pattern of racketeering activity which also involves a scheme to increase revenue for Defendants and the Sales Channel Persons through fraudulent and/or misleading representations and omissions concerning the nature and performance of the indices offered by the Policies.

134.    The Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the marketing, promotion, advertisement and sale of the Policies to consumers nationwide, and the receipt of premiums, commissions, and surrender charges from the sale of those Policies.

135.    At all relevant times, each associate in the Enterprise was aware of the fraudulent scheme to sell the Policies, was a knowing and willing participant in the fraudulent scheme, and reaped profits therefrom.

F. *__Predicate Acts__*

136.    Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendants have engaged and continue to engage in conduct violating each of these laws to effectuate their scheme.

137.    For the purpose of executing and/or attempting to execute the above-described knowing scheme to sell the challenged Policies by misrepresenting and omitting material information regarding the critical attributes of the Indexed Strategies, which if disclosed, would reveal these Policies to be inferior to alternative investments, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to marketing brochures, the Policies, disclosure forms, performance illustrations, applications, contracts, training manuals, video tapes, correspondence, leads lists, premium and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of the Policies.

138.    For the purpose of executing and/or attempting to execute the above-described knowing scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to, the marketing brochures, the Policies, disclosure forms, performance illustrations, applications, contracts, training manuals, video tapes, correspondence, leads lists, premium and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of the Policies. In addition,

32

pursuant to and as part of the scheme to defraud, Defendants intended to and did receive payments from Plaintiffs and other members of the Class that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343.

139.    The Sales Channel Persons aided and abetted violations of the above laws.

140.    Many of the precise dates of Defendants' fraudulent uses of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to its books and records. Indeed, the success of the fraudulent scheme depends upon secrecy, and Defendants have withheld details of their scheme from Plaintiffs and other members of the Class. Generally, however, Plaintiff can describe the occasions on which the predicate acts of mail and wire fraud occurred, and how those acts were in furtherance of a scheme. They include thousands of internet postings and communications to perpetuate and maintain the scheme, including, among other things:

- Delivery and return of the Policies and Illustrations;

- Processing of applications for the Policies and verifications of the Illustrations;

- Processing premium payments from purchasers of the Policies;

- Paying and receiving commissions for the marketing, referral and sale of the Policies;

- Disseminating fraudulent and deceptive marketing and sales brochures, illustrations and other materials describing the Policies to the Sales Channel Persons; and

- Disseminating training materials for selling the Policies.

141.    The foregoing materials sent or received by Defendants by the U.S. Mail, internet postings, emails, wire or other electronic media contained, *inter alia*:

- False and/or misleading representations and omissions about the nature and performance of the Policies and Indexed Strategies; and

- False and/or misleading representations and omissions about historical performance of the Policies and the Indexed Strategies, through false and misleading "back-casting."

142.    Defendants' management at its corporate headquarters has communicated by U.S. Mail, wire, internet postings, emails and by facsimile with the Sales Channel Persons in furtherance of their scheme with the Sales Channel Persons.

143.    Defendants' false and/or misleading representations and omissions of material facts were knowing and intentional and made for the purpose of deceiving Plaintiff and the other members of the Class.

144.    Defendants and their co-conspirators either knew or recklessly disregarded the fact that their false and/or misleading representations and omissions were material and were relied upon by Plaintiff and the other members of the Class as shown by their payments to Defendants for the Policies, the verifications of the Illustrations, and the allocation of Accumulated Values to the Indexed Strategies.

145.    Although not necessary to make out a violation of the mail or wire fraud statute,[8] Plaintiff and the other members of the Class relied, to their detriment, on Defendants' false and/or misleading representations and material omissions, which were made by means of Defendants' uniform Policies and Illustrations. Again, such reliance is evidenced by their purchase of the Policies, the verifications of the Illustrations, and the allocation of Accumulated Values to the

---

[8] *See Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131 (2008).

Indexed Strategies, which they would have no reason to select absent Defendants' misleading description of those indices.

146.    Furthermore, as a direct and proximate consequence of Defendants' false and/or misleading representations and material omissions, Defendants and their co-conspirators were able to increase the price and cost of the Policies, including the fees and charges collected by members of the Enterprise, for all members of the Class, thereby overcharging all such class members. For example, as a direct and proximate result of the false and/or misleading representations and omissions described above, Defendants induced members of the Class to allocate Account Values to the Indexed Strategies, charging all class members with annual spreads and other charges that would not apply to allocations made under different options or to premiums paid for policies that do not use such proprietary indices, thereby increasing the price and cost of the Policies to all Class members.

147.    Defendants knew the Plaintiff and the other members of the Class relied on its false and/or misleading representations and omissions about the nature and performance of the Indexed Strategies. Defendants knew that the purchasers of the Policies would incur substantial cost and loss as a result.

148.    Consequently, Defendants have obtained money and property belonging to Plaintiff and the other members of the Class, who have been injured in their business or property by Defendants' overt acts of mail and wire fraud, and by its aiding and abetting each other unnamed co-conspirators' acts of mail and wire fraud.

**G.  _Conducting the Affairs through a Pattern of Racketeering Activity_**

149.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of

racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years. In fact, Defendants have committed or aided and abetted in the commission of countless acts of racketeering activity. Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiff and other members of the Class.

150.    The multiple predicate acts of racketeering activity that Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other and form part of the Enterprise's ongoing and regular way of doing business. Together they amount to and pose a clear threat of continued racketeering activity, as evidenced by the ongoing sale of the Policies, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). In other words, the misconduct alleged by Plaintiff occurred and went on long enough and with enough of a relationship with the Enterprise to constitute a pattern of racketeering activity actionable under RICO.

## CLASS ACTION ALLEGATIONS

151.    Plaintiff brings this case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of herself Class defined as follows:

> All persons who own or owned a SummitLife, PeakLife or FlexLife IUL universal life policy issued by Defendants and who allocated some or all of the Accumulated Value under those Policies to the Balanced Trend Index and/or the US Pacesetter Index.

152.    Excluded from the Class are the Defendants, any entity in which the Defendants have a controlling interest, any of the officers, directors, or employees of the Defendants, the legal representatives, heirs, successors, and assigns of the Defendants, anyone employed with Plaintiff's counsel's firms, any Judge to whom his case is assigned, and the Judge's immediate family.

153.    The members of the Class are so numerous that joining all members is impractical. Upon information and belief, the Class includes thousands of persons.

154.    Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiff will fairly and adequately protect the interests of the Class and has no interest that is adverse to, or which materially conflicts with, the interests of other members of the Class. Plaintiff has also engaged the services of legal counsel who are experienced in complex class litigation, will adequately prosecute this action, and will assert and protect the rights of an otherwise represent Plaintiff and the other members of the putative Class.

155.    Plaintiff's claims are typical of the claims of the members of the Class because the express terms of the Policies purchased from Defendants by Plaintiff and Class members contain materially identical Illustrations concerning Indexed Strategies.

156.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include:

      (a) Whether Defendants' conduct is actionable as a breach of contract under the common law of the respective states;

      (b) Whether Defendants uniformly made false and/or misleading representations and omitted material information regarding the nature and performance of the Indexed Strategies, and thus of the Policies;

      (c) Whether Defendants engaged in mail and/or wire fraud;

      (d) Whether Defendants engaged in a pattern of racketeering activity;

      (e) Whether the Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

(f)  Whether Defendants and the Sales Channel Persons conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

(g)  Whether Plaintiffs and the other members of the Class are entitled to damages from Defendants, and, if so, in what amount.

157.  The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Class members. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of these claims. Even if class members could afford to pursue individual litigation, the court system could not. Individualized litigation would risk inconsistent or contradictory judgments while increasing the delay and expense to all parties, and to the judicial system, from the complex legal and factual issues presented here. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

158.  Certification is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Breach of Contract on behalf of Plaintiff and the Class**

159.  Plaintiff re-alleges all prior allegations in the Complaint.

160.    Plaintiff and the Class purchased Policies from Defendants.

161.    The Policies are valid and enforceable contracts between Defendants and Plaintiff and the Class.

162.    Plaintiff and the Class substantially performed their obligations under the Policies.

163.    As set forth above, the Policies promised Plaintiff and the Class that they could allocate their Accumulated Values to the Indexed Strategies ***as described in the Policies and Illustrations***.

164.    However, as set forth above, the Indexed Strategies actually provided by Defendants for the allocation of Accumulated Values did not match the substantive qualities of those strategies as promised and described in the policies, in at least the three ways alleged above.

165.    First, Defendants breached their promise that the US Pacesetter Index was a total return fund when in fact it was an excess return fund. As a result, it had the potential to earn a positive return only after exceeding the break-even rate.

166.    Second, Defendants breached their promise that the US Pacesetter Index and the Balanced Trend Index had twenty years of historical returns when, in fact, they had been in existence for only a fraction of that time period and, therefore, could not have had any historical returns. In fact, these "historical" returns were a fiction of a back-casting model.

167.    Third, Defendants breached their promise that "[i]f no index value was published on the beginning and end dates of the calendar year, then the most recent previous index value [would be] used to determine the historical rate."

168.    Fourth, Defendants breached their promise that the US Pacesetter Index and the Balanced Trend Index had returns and crediting rates based on historical information, excluding

changes in the Cap and Participation Rates. In fact, statistical analyses demonstrate that these returns and crediting rates had less than a 1 in 1,000 chance of success and were a sham.

169.    Defendants' failure to provide Indexed Strategies as promised and described constitutes a breach of the Policies.

170.    As a direct and proximate result of Defendants' ongoing and continuing breach, Plaintiff and the Class have sustained damages that are continuing in nature in an amount to be determined at trial.

## SECOND CLAIM

### Violation of RICO, 18 U.S.C. § 1962(c) on behalf of Plaintiff and the Class

171.    Plaintiff re-alleges all prior allegations in the Complaint.

172.    This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

173.    In violation of 18 U.S.C. §1962(c), Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5). Therefore, Defendants have violated 18 U.S.C. §1962(c).

174.    As a result and by reason of the foregoing, Plaintiff and the other members of the Class have been injured, suffered irreparable harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

175.    In addition, because Defendants have violated 18 U.S.C. §§ 1962(c), and absent equitable relief from the Court will continue to do so in the future, enjoining Defendants from

committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962.

## PRAYER FOR RELIEF

For these reasons, Plaintiff prays that judgment be entered against Defendants and requests that the Court award the following relief:

A.    An order certifying the Class, appointing Plaintiff as a representative of the Class, appointing Plaintiff's counsel as Class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class members;

B.    A judgment against Defendant for the causes of action alleged against it;

C.    An Order awarding Plaintiffs and Class members entitled to such other equitable relief as the Court deems proper;

D.    Compensatory damages in an amount to be proven at trial;

E.    Punitive, treble and exemplary damages;

F.    Pre-judgment and post-judgment interest at the maximum rate permitted by law;

G.    Plaintiffs' attorneys' fees, expert witness fees and other costs;

H.    Any other relief the Court determines is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: October 31, 2024                    Respectfully submitted,

                                           */s/ Pietro J. Lynn* _____
                                           Pietro J. Lynn
                                           Lynn, Lynn, Blackman & Toohey, P.C.
                                           76 St. Paul Street
                                           Burlington, VT  05482
                                           (m) 802.777.7759
                                           (o) 802.860.1500
                                           PLynn@lynnlawvt.com

                                           Robert A. Izard (*pro hac vice forthcoming*)
                                           Craig A. Raabe (*pro hac vice forthcoming*)
                                           Seth R. Klein (*pro hac vice forthcoming*)
                                           IZARD, KINDALL & RAABE LLP
                                           29 South Main Street, Suite 305
                                           West Hartford, CT  06107
                                           Tel: (860) 493-6292
                                           Fax: (860) 493-6290
                                           rizard@ikrlaw.com
                                           craabe@ikrlaw.com
                                           sklein@ikrlaw.com

                                           Joseph Gentile (*pro hac vice forthcoming*)
                                           Ronen Sarraf (*pro hac vice forthcoming*)
                                           SARRAF GENTILE LLP
                                           10 Bond Street #212
                                           Great Neck, NY 11021
                                           Tel: (516) 699-8890
                                           Fax: (516) 699-8968
                                           joseph@sarrafgentile.com
                                           ronen@sarrafgentile.com

                                           ATTORNEYS FOR PLAINTIFF SANYA
                                           VIRANI