U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2026 JAN -5 PM 3: 14

CLERK

BY _____ (signature)
DEPUTY CLERK

SANYA VIRANI,                          )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )       Case No. 2:24-cv-01150
                                       )
NLV FINANCIAL CORPORATION,             )
NATIONAL LIFE INSURANCE COMPANY,       )
and LIFE INSURANCE COMPANY OF          )
THE SOUTHWEST,                         )
                                       )
        Defendants.                    )

**OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS**
**FIRST AMENDED CLASS ACTION COMPLAINT AND**
**GRANTING LEAVE TO AMEND**
(Doc. 33)

On October 31, 2024, Plaintiff Sanya Virani ("Plaintiff") brought suit individually

on behalf of herself and as a class action on behalf of those similarly situated

(collectively, "Plaintiffs") against NLV Financial Corporation ("NLV") and its wholly

owned subsidiaries, National Life Insurance Company ("NLIC") and Life Insurance

Company of the Southwest ("LICS") (collectively, "Defendants"). Plaintiff filed a first

amended class action complaint ("FAC") on June 16, 2025. (Doc. 31.) Defendants moved

to dismiss the FAC on July 16, 2025. (Doc. 33.) Plaintiff opposed the motion on August

15, 2025, (Doc. 37), and Defendants replied on August 29, 2025. (Doc. 38.) The court

heard oral arguments on Defendants' motion to dismiss on September 15, 2025,

("September 15, 2025 Hearing"), and took the pending motion under advisement.

Plaintiff is represented by Craig A. Raabe, Esq., Joseph Gentile, Esq., Robert A.

Izard, Esq., Ronen Sarraf, Esq., Seth R. Klein, Esq., and Pietro J. Lynn, Esq. Defendants

are represented by Alan E. Schoenfeld, Esq., Elizabeth Bedrick, Esq., Jessica L. Lewis,

Esq., Justin B. Barnard, Esq., Kendall A. Hoechst, Esq., Ritchie E. Berger, Esq., and

Timothy Perla, Esq.

## I.    Factual and Procedural Background.

### A.    Allegations in the FAC.

Plaintiff brought suit individually and on behalf of those similarly situated, namely, those who purchased an Index Universal Life ("IUL") insurance policy from Defendants and allocated some or all of their policy's value to the Credit Suisse No Cap Annual Point-to-Point Indexed Strategy ("Balanced Index") and/or the US Pacesetter No Cap Annual Point-to-Point Indexed Strategy ("Pacesetter Index") (collectively, "Indices").[1] To sell these IUL insurance policies ("Policies"), Defendants partner with independent marketing organizations ("IMOs") to market the Policies, and IMOs then recruit broker general agencies ("BGAs") who provide support for independent agents, and the independent agents, in turn, sell the Policies.

On June 2, 2023, Plaintiff communicated with Defendants' agent concerning purchasing a life insurance policy, and thereafter they continued to communicate for several months until Plaintiff decided to purchase an IUL policy (the "Policy") from Defendants and completed and submitted an application for insurance. In doing so, she selected the Pacesetter Index. On September 8, 2023, LICS issued Plaintiff her Policy, and the following day, it sent a letter to her home. This letter contained a National Life Insurance Illustration (the "Illustration"); an Indexed Universal Life Buyer's Guide (the "Buyer's Guide"); the Policy, No. LS1539788; and the life insurance application completed by Plaintiff.

The Policy issued to Plaintiff had a base coverage of $2,767,336. Under the Policy, Plaintiff is responsible for paying expenses which include the monthly cost of insurance, the monthly expense charge, the monthly policy fee, the monthly accumulated value charge, and the monthly cost of any riders. The Policy's monthly accumulated

---

[1] No class has been certified in this action, but Plaintiff defines the class as follows: "All persons who own or owned a SummitLife, PeakLife or FlexLife IUL universal life policy issued by Defendants and who allocated some or all of the Accumulated Value under those Policies to the Balanced [] Index and/or the [] Pacesetter Index." (Doc. 31 at 36, ¶ 151.)

2

value is the net premium plus the sum of any returns from any interest crediting strategies minus those expenses ("Accumulated Value").

In the FAC, Plaintiff alleges the Policy requires her "to apportion the Accumulated Value among various [i]nterest [c]rediting [s]trategies offered by Defendants, including '[f]ixed-[t]erm [s]trategies' and '[i]ndexed [s]trategies' – the returns from which are credited to the Policy's Accumulated Value." (Doc. 31 at 6, ¶ 25.) Plaintiff asserts that she "allocated 100% of the Accumulated Value under her Policy to the [] Pacesetter Index." *Id.* at 25, ¶ 106.

The Illustration sent to Plaintiff after the Policy was issued provided information concerning indexed strategies, including the Balanced Index and Pacesetter Index. Indexed strategies are comprised of notional assets, meaning assets that do not own stocks, bonds, or any other assets and in which there can be no investment. Instead, indexed strategies track the returns of underlying assets, which Defendants use to calculate the amount to credit to an insurance policy's Accumulated Value. Defendants license the indexed strategies offered under their Policies from the creators of each indexed strategy.

### 1.    The Illustration's Characterization of the Pacesetter Index.

Plaintiff characterizes the Balanced Index Illustration as follows:

> The [i]ndex has a 0.5% per annum embedded fee deducted on a daily basis. The index fee will place a drag on the performance of the index, offsetting any appreciation of its portfolio, exacerbating any depreciation of its portfolio[,] and causing the level of the index to decline steadily if the value of its portfolio remains relatively constant.

*Id.* at 8, ¶ 36. Plaintiff alleges the Illustration expressly characterized the Balanced Index as "an excess return index, which means that it reflects the return of components net of the cost of funding a hypothetical investment in them. The [Balanced] Index returns are likely to be negatively affected by the cost of funding." *Id.* at 9, ¶ 36 (emphasis and internal quotation marks omitted).

Plaintiff describes the Pacesetter Index Illustration as providing the following:

> In calculating the performance of the [i]ndex, SG [Americas Securities, LLC,] deducts a maintenance fee of 0.50% per annum on the level of the

3

[i]ndex, and fixed transaction and replication costs, each calculated on a
daily basis. The transaction and replication costs cover, among other things,
rebalancing and replication costs. The total amount of transaction and
replication costs is not predictable and will depend on a number of factors,
including the leverage of the [i]ndex, which may be as high as 200%, the
performance of the components underlying the [i]ndex, market conditions
and the changes in the market environments, among other factors. The
transaction and replication costs, which are increased by the [i]ndex's
leverage, and the maintenance fee will reduce the potential positive change
in the [i]ndex and increase the potential negative change in the [i]ndex.
While the volatility control applied by the [i]ndex may result in less
fluctuation in rates of return as compared to indices without volatility
controls, it may also reduce the overall rate of return as compared to
products not subject to volatility controls.

*Id.* at ¶ 37. Contrary to the Balanced Index, Plaintiff alleges that the Illustration did not
explicitly characterize the Pacesetter Index as an excess return index nor "describe the
investment profile or asset allocation of the [] Pacesetter Index." *Id.* at 13, ¶ 51.

In the Buyer's Guide, Plaintiff alleges that "Defendants represented that the
returns from the [Pacesetter] Index are from a mix of the returns from U.S. equities, U.S.
government debt[,] and commodities within the agriculture, metals[,] and energy
sectors[.]" (Doc. 31 at 13, ¶ 51.) Plaintiff claims that according to a Société Générale[2]
brochure issued in April 2024, the Pacesetter Index is an excess return index, which
means it derives its returns from investing in futures contracts, producing returns from
three sources. The relevant source of returns that Plaintiff claims the brochure identifies
is "interest earned on the cash (or other) collateral deposited in connection with the
purchases of such a future contract (known as the 'collateral return.')." *Id.* at ¶ 52
(emphasis omitted). The brochure allegedly states that an excess return index "will not
generate the same returns that would be obtained from investing directly in future
contracts underlying the [i]ndex components because the collateral return is not used in
calculating an excess return index." *Id.* The brochure is not attached to the FAC.

Plaintiff alleges "Defendants misleadingly stated that the [] Pacesetter Index
returns are from a mix of the returns from U.S. equities, U.S. government debt[,] and

---

[2] Société Générale is a banking and financial services company.

4

commodities while failing to disclose that the [] Pacesetter Index returns were limited to the excess above the collateral return[,]" *id.* at 14, ¶ 56, and the Buyer's Guide's "exclusion of the collateral return is effectively a massive undisclosed 'fee.'" *Id.* at ¶ 54. As a result, Plaintiff claims that "[the] Pacesetter Index returns were not calculated or credited in accordance with the terms of the Policy." *Id.* at ¶ 55.

### 2.    The Illustration's Characterization of Return Rates.

Plaintiff alleges that the Illustration contains a chart which provides two sets of return rates for both Indices. The first set displays return rates, also referred to as crediting rates, for each of the Indices. The second set displays return rates for each of the Indices with a 0% floor, no cap, and high participation rate.

With respect to the second set of return rates, the Illustration allegedly states that "the historical rates shown below are determined by applying the current [c]ap, [p]articipation[,] and [f]loor [r]ates to the most recent [twenty] full calendar years of historical index performance[.]" (Doc. 31 at 10, ¶ 43) (emphasis, brackets, and internal quotation marks omitted). Plaintiff acknowledges that the Illustration contains a disclaimer which notes that "historical performance of the S&P 500 Index, [Balanced Index] and [] Pacesetter Index should not be considered a representation of past or future performance of any of the [i]ndexed [s]trategies available in this policy[.]" *Id.* (emphasis and internal quotation marks omitted). The Illustration also allegedly represents that the historical rates in the chart "do not represent the actual interest that would have been credited because the [c]ap [r]ate and [p]articipation [r]ate would have changed over time and actual results would have been different." *Id.* at ¶ 44 (emphasis and internal quotation marks omitted).

Plaintiff alleges that, although the Illustration characterizes its chart as providing "historical rates" for both Indices based on "[twenty] full calendar years of historical index performance[,]" *id.* at ¶ 43 (emphasis and internal quotation marks omitted), the Pacesetter Index did not exist prior to December 10, 2021. Plaintiff asserts that "[c]onsequently, at most, less than two years of returns could have been based on historical information." *Id.* at 14, ¶ 59. Similarly, Plaintiff alleges that the Balanced Index

did not exist prior to November 20, 2017 and, therefore, "less than six years of returns could have been based on historical information." *Id.* at 15, ¶ 64.

For the Balanced Index only, Plaintiff concedes that the final page of the Illustration provides the following disclaimer:

> No actual investment which allowed the tracking of the performance of the Index was possible before 11/20/2017. The return results provided herein are illustrative only and were derived by means of a retroactive application of a back-casted model designed with the benefit of hindsight. These back-casted, hypothetical, historical annualized index returns have inherent limitations. No representation is made that in the future the Index will have the returns shown. Alternative modeling techniques or assumptions might produce significantly different results and may prove to be more appropriate. Actual annualized returns may vary materially from this analysis. Any effective volatility controls may reduce the overall rate of return.

(Doc. 31 at 16, ¶ 67) (emphasis omitted).

The Illustration allegedly contains no similar language concerning the Pacesetter Index, which Plaintiff claims renders the Illustration "fraudulent and misleading[,]" because it "promised that the [] Pacesetter Index returns and crediting rates were based on historical information[.]" *Id.* at 15, ¶ 61. Plaintiff characterizes the Balanced Index disclaimer as misleading because, "[d]ue to its reaffirmation that [the Balanced I]ndex's returns are 'historical,' the 'fine print's' inconsistent and irreconcilable reference to a 'back-casted model' does nothing to mitigate the fraudulent statements in the Illustration." *Id.* at 16, ¶ 68.

### 3.   The Illustration's Displayed Return Rates.

Plaintiff asserts that in an indexed strategy, the participation rate is the percentage of the annual increase in an indexed strategy that is credited to the Policy's Accumulated Value, the cap rate is an upper limit on the amount of returns that can be credited from an indexed strategy's gains, and the floor rate is a lower limit on the amount of returns that can be credited from an indexed strategy's gains or losses.

With respect to the Pacesetter Index, the second set of return rates in the Illustration's chart allegedly displays a crediting rate based on a participation rate of

6

215%, a floor rate of 0%, and no cap. To achieve a 215% participation rate for the Pacesetter Index, Plaintiff alleges Defendants "would have to buy more than twice as many futures contracts than if they were crediting returns based on the performance of [] Pacesetter Index alone." *Id.* at 22, ¶ 95. To attain a 0% floor rate for the Pacesetter Index, Plaintiff claims Defendants would need to "buy options to hedge against the prospect that the value of the futures contracts that are designed to replicate the [] Pacesetter Index do not fall in value." *Id.* at 23, ¶ 96. Plaintiff asserts that obtaining a 215% participation rate and a 0% floor rate for the Pacesetter Index, as allegedly represented in the Illustration's chart, would require "additional costs" and result in further reduction of the returns credited under the Policy from the Pacesetter Index. *Id.* at ¶ 97. The chart allegedly does not account for these costs and losses in the displayed return rates, and as a result, "the represented return is more than double the represented 'historical' return of the underlying [] Pacesetter Index[,]" rendering the displayed return rates "even more improbable than the back-cast [Pacesetter] Index returns." (Doc. 31 at 11-12, 23 ¶¶ 49, 97.)

   With respect to the Balanced Index, the second set of return rates in the Illustration's chart allegedly displays a crediting rate based on a participation rate of 200%, a floor rate of 0%, and no cap. Plaintiff similarly alleges that "the [c]hart only shows the benefit of a 200% [p]articipation [r]ate and a 0% [f]loor [r]ate without accounting for the cost of that enhanced participation rate and floor [rate]." *Id.* at 23, ¶ 99. Plaintiff therefore likewise claims that "[b]ecause losses are not included in the crediting rate and not deducted from returns, the represented return is more than double the represented 'historical' return of the underlying Balanced [] Index[,]" *id.* at 11, ¶ 47, which makes the Balanced Index's represented return rates "similarly improbable." *Id.* at 23, ¶ 99.

   Plaintiff asserts that the crediting rate under Actuarial Guideline[3] 49A is the lesser rate between the applicable interest crediting strategy and the benchmark indexed

---

[3] Actuarial Guidelines are a set of rules used by the insurance industry in the United States.

account, which at the date of the Illustration was 6.42%. Plaintiff claims the Illustration displays the Balanced Index and Pacesetter Index as having crediting rates greater than 6.42% when the lesser value of 6.42% would be applied to the Policy. Plaintiff thus alleges that the Illustration was "designed to suggest that the [I]ndices with excessive crediting rates existed for twenty years with historical success during that time, which . . . they did not." *Id.* at 12, ¶ 50.

Plaintiff asserts that Defendants used "a fraudulent sales trick" because the Illustration's represented returns for the Indices contained "manufactured[] [and] misleading performance . . . based on a highly speculative back-cast model such that these [I]ndices had less than a 1 in 1,000 chance of performing consistent with the misleading 'historical' performance." *Id.* at 2, ¶ 5 (emphasis omitted).

### 4.    Plaintiff's Claims.

Plaintiff asserts that she has suffered harm from Defendants' "[m]isleading [d]escriptions" of the Indices in the Illustration, (Doc. 31 at 25), because she allocated 100% of her Policy's Accumulated Value to the Pacesetter Index and had 0% interest credited to her account from the allocation period of September 22, 2023, to September 21, 2024. *Id.* at ¶ 106. Plaintiff can cancel the Policy only by paying a surrender charge, which is $49,618.33 in the first year of the Policy, which then gradually declines to $5,202.59 in the tenth year of the Policy, and is finally eliminated by the eleventh year of the Policy. As a result, Plaintiff claims that she "stands to lose tens of thousands of dollars in [s]urrender [c]harges if she cancels and surrenders her Policy in the short term, largely or completely eliminating all of the Policy's Accumulated Value and resulting in a complete loss of the premiums she has already paid." *Id.* at 26, ¶ 111. Plaintiff does not address whether she may change her selection of Indices or whether there is a penalty for doing so.

In her FAC, Plaintiff asserts three causes of action against Defendants: Breach of Contract (Count I), Violation of Mass. Gen. Laws ch. 93A § 9(3) and Other States' Similar Unfair and Deceptive Trade Practices Statutes (Count II), and Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)

(Count III).

**B.    The September 15, 2025 Hearing.**

At the September 15, 2025 Hearing, the court dismissed Plaintiff's claims against Defendants NLV and NLIC without prejudice because Plaintiff's counsel, Seth R. Klein, Esq., conceded that there were no factual allegations supporting Plaintiff's claims against them.[4] The court also dismissed, without prejudice, Plaintiff's allegations that the Illustration's description of volatility controls and statement that "[i]f no index value was published on the beginning and end dates of the calendar year, then the most recent previous index value [would be] used to determine the historical rate[]" were misleading because Attorney Klein stated Plaintiff abandoned these claims. (Doc. 31 at 39, ¶ 167) (internal quotation marks omitted) (first and second alterations in original).

**II.    Conclusions of Law and Analysis.**

**A.    Standard of Review.**

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Parties must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (citation omitted).

---

[4] Although only LICS remains as a defendant, this Order and Opinion refers to "Defendants" because the FAC uses that term.

9

Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a party will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

## B.    Whether the Court Should Consider the Policy and the Illustration.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted). "Courts have generally held a document to be incorporated by reference where it has been extensively quoted in the complaint or where the complaint relied on its terms." *Scott v. Romano*, 790 F. Supp. 3d 226, 231-32 (W.D.N.Y. 2025) (collecting cases); *see also DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) ("To be incorporated by reference, the complaint must make 'a clear, definite[,] and substantial reference to the documents.'") (citations omitted).

At the motion to dismiss stage, a court may also consider a document that is "'integral' to the complaint[,]" *DiFolco*, 622 F.3d at 111 (citations omitted), provided it is "clear on the record that no dispute exists regarding the authenticity or accuracy of the document[]" and "clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (citations omitted). A document is integral to a complaint when "the complaint 'relies heavily upon its terms and effect[.]'" *DiFolco*, 622 F.3d at 111 (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

Here, the FAC incorporates both the Policy and Illustration by reference because Plaintiff repeatedly references both documents and extensively quotes from them. *See Tavenner v. Int'l Bus. Machs. Corp.*, 2022 WL 4449215, at *2 (S.D.N.Y. Sept. 23, 2022), *aff'd*, 2023 WL 4984758 (2d Cir. Aug. 4, 2023) (holding an arbitration agreement was incorporated by reference because "the [c]omplaint as well as the [p]arties' briefing

10

papers quote extensively from the [a]rbitration [a]greement[]"); *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 331 (S.D.N.Y. 2003) (holding a contractual agreement was incorporated by reference because "the [c]omplaint makes several substantial references to the [a]greement, even quoting certain paragraphs of the [a]greement verbatim[]"). The Policy and Illustration are also integral to the FAC because Plaintiff's breach of contract claim relies on their terms. *See, e.g.*, *Ultimate Nutrition, Inc. v. Leprino Foods Co.*, 747 F. Supp. 3d 371, 378 (D. Conn. 2024) ("When a claim is for breach of contract, 'the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim.'") (citation omitted). The court therefore considers the Policy and Illustration in ruling on Defendants' motion to dismiss.

## C.    Whether Plaintiff's Breach of Contract Claim Should Be Dismissed (Count I).

Plaintiff claims Defendants breached the Illustration and the Buyer's Guide in the following four ways:

[] First, Defendants breached their promise that the [] Pacesetter Index was a total return fund when in fact it was an excess return fund. As a result, it had the potential to earn a positive return only after exceeding the break-even rate.

[] Second, Defendants breached their promise that the [] Pacesetter Index and the Balanced [] Index had twenty years of historical returns when, in fact, they had been in existence for only a fraction of that time period and, therefore, could not have had any historical returns. In fact, these "historical" returns were a fiction of a back-casting model.

[] Third, Defendants breached their promise that "[i]f no index value was published on the beginning and end dates of the calendar year, then the most recent previous index value [would be] used to determine the historical rate."

[] Fourth, Defendants breached their promise that the [] Pacesetter Index and the Balanced [] Index had returns and crediting rates based on historical information, excluding changes in the [c]ap and [p]articipation [r]ates. In fact, statistical analyses demonstrate that these returns and crediting rates had less than a 1 in 1,000 chance of success and were a sham.

(Doc. 31 at 39-40, ¶¶ 165-68.)

Defendants argue that Plaintiff's breach of contract claims fail because the

Illustration and the Buyer's Guide are not contracts and because, in any event, the Plaintiff entered into and was issued the Policy *prior* to her receipt of the Illustration and the Buyer's Guide. Under Massachusetts law, an insurance policy and its application "constitute the entire contract between the parties." Mass. Gen. Laws ch. 175 § 132(3). Although at the September 15, 2025 Hearing Attorney Klein conceded that "the [I]llustration is not part of the contract," (Doc. 41 at 23:7), in her opposition, Plaintiff argues that the Illustration and the Buyer's Guide are parol evidence admissible to fill gaps in the Policy because they are necessary to define the Indices, which are allegedly material, undefined contract terms.

Massachusetts law governs Plaintiff's breach of contract claim because the Policy was applied for and issued in Massachusetts. *See Fellows v. Mauser*, 302 F. Supp. 929, 933 (D. Vt. 1969) ("The Vermont rule is that the law of the place of the making of the insurance contract governs its validity, its interpretation[,] and its construction.") (citing *Vermont Mut. Fire Ins. Co. v. Van Dyke*, 165 A. 906 (Vt. 1933)). Under Massachusetts law, when a contract is fully integrated, "[t]he parol evidence rule [] bars the introduction of prior or contemporaneous written or oral agreements that contradict, vary, or broaden an integrated writing." *Kobayashi v. Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 496, 678 N.E.2d 180, 184 (1997) (citations omitted). Put differently, in construing fully integrated contracts, "[Massachusetts courts] give the [contractual] language its plain and ordinary meaning, without reference to any extrinsic evidence." *Siebe, Inc. v. Louis M. Gerson Co.*, 74 Mass. App. Ct. 544, 550, 908 N.E.2d 819, 825 (2009).

"An integrated agreement is a writing that constitutes a final expression of one or more terms of an agreement." *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1123 (1st Cir. 1995). Massachusetts law provides a presumption of integration: "Where the writing shows on its face that it is the entire agreement of the parties and 'comprises[]all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction.'" *Bendetson v. Coolidge*, 7 Mass. App. Ct. 798, 802-03, 390 N.E.2d 1124, 1127 (1979).

"Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." *Coll*, 50 F.3d at 1123 (internal quotation marks and citations omitted). "A contract's integration clause . . . is a good hint that the parties intended it to be fully integrated[.]" *Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 535 (1st Cir. 2022) (internal quotation marks omitted) (quoting *Realty Fin. Holdings, LLC v. KS Shiraz Manager, LLC*, 86 Mass. App. Ct. 242, 247, 18 N.E.3d 350, 355 (2014)).

When a contract is fully integrated, the parol evidence rule permits the introduction of extrinsic evidence that "elucidates the meaning of an ambiguous contract term." *Kobayashi*, 42 Mass. App. Ct. at 496, 678 N.E.2d at 184 (citations omitted). A contract term is ambiguous if it is "susceptible of more than one meaning[.]" *Sullivan v. Southland Life Ins. Co.*, 67 Mass. App. Ct. 439, 443, 854 N.E.2d 138, 141-42 (2006) (internal quotation marks and citation omitted). In determining whether there is an ambiguity, "the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 648, 888 N.E.2d 897, 907 (2008) (citation omitted). The court must find the ambiguity on the face of the contract or in its application, and extrinsic evidence cannot be used to create the ambiguity. *See id.* at 650, 888 N.E.2d at 908.

The Policy contains an integration clause stating: "Entire Contract[.] On the Effective Date the entire contract between the parties is this [P]olicy and a copy of the application and all riders and endorsements, and any amendments thereto, which are attached at issue." (Doc. 33-5 at 25.) Plaintiff fails to allege that the Policy was not intended to be the final expression of the parties' agreement. Because the Policy is fully integrated, the Illustration and the Buyer's Guide are admissible extrinsic evidence only if an exception to the parol evidence rule applies.

In arguing that the Policy is ambiguous, Plaintiff relies on *Kobayashi v. Orion*

13

*Ventures, Inc.*, which involved a noncompetition clause in a lease agreement that provided: "Landlord will not permit the operation of any other delis in the [b]uilding during the term of this [l]ease." *Kobayashi*, 42 Mass. App. Ct. at 493, 678 N.E.2d at 182 (internal quotation marks omitted). The court was tasked with determining what constituted a "deli" under the agreement. Notwithstanding the lease's integration clause, the court admitted extrinsic evidence to define a "deli" because the term "was not defined in the lease; nor was it self-defining." *Id.* at 496, 678 N.E.2d at 184 (citations omitted).

In contrast, the Policy in this case identifies the Indices offered as the "Annual Point-to-Point Indexed Strategy – US Pacesetter No Cap Rider" and the "Annual Point-to-Point Indexed Strategy – Credit Suisse No Cap Rider[.]" (Doc. 33-5 at 68, 74.) There is no ambiguity in these terms, and Plaintiff does not articulate any principled argument as to why they are susceptible to more than one meaning. Accordingly, the Illustration and the Buyer's Guide cannot be admitted as extrinsic evidence because the Policy is not ambiguous. Using the Illustration and the Buyer's Guide to define the Indices beyond the scope of their definitions in the Policy would broaden the Policy in violation of the parol evidence rule. *See Siebe, Inc.*, 74 Mass. App. Ct. at 550, 908 N.E.2d at 825 ("[W]hen a contract is clear and unambiguous, the parol evidence rule bars admission of extrinsic evidence that would purport to contradict or modify the express terms of the written contract.") (internal quotation marks and citations omitted). Moreover, Plaintiff entered into the Policy as a contract *before* she received the Illustration and the Buyer's Guide which is fatal to her breach of contract claims.

Because Plaintiff's breach of contract claim arises solely from the Illustration and the Buyer's Guide, Plaintiff fails to state a plausible claim for breach of contract under Massachusetts law. Plaintiff's breach of contract claim is therefore DISMISSED.

14

### D.    Whether Plaintiff's Violation of Mass. Gen. Laws Chapter 93A and Other States' Similar Unfair and Deceptive Trade Practices Statutes Claim Should Be Dismissed (Count II).

In the FAC, Plaintiff alleges that Defendants violated Chapter 93A[5] because "the allocation of Accumulated Values did not match the substantive qualities of those strategies as promised and described in the [P]olicies[.]" (Doc. 31 at 40, ¶ 174.) Plaintiff alleges Defendants' deceptive conduct consisted of (1) stating that "the [] Pacesetter Index was a total return fund when in fact it was an excess return fund[]" with "the potential to earn a positive return only after exceeding the break-even rate[]"; (2) claiming that the Indices had twenty years of historical returns when "these 'historical' returns were a fiction of a back-casting model[]"; and (3) providing returns and crediting rates for the Indices based on "historical information" when "statistical analyses demonstrate that these returns and crediting rates had less than a 1 in 1,000 chance of success and were a sham." *Id.* at 39-40, ¶¶ 165-66, 168. Again, each of these alleged misrepresentations was made *after* the Policy was issued.

Mass. Gen. Laws 93A provides a private cause of action for consumers who suffer an injury as a result of unfair or deceptive acts or practices. "A successful claim under this section [] requires, at a minimum, a showing of (1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury." *Casavant v. Norwegian Cruise Line, Ltd.*, 76 Mass. App. Ct. 73, 76, 919 N.E.2d 165, 168-69 (2009), *aff'd*, 460 Mass. 500, 952 N.E.2d 908 (2011) (citations omitted).

---

[5] Before bringing a claim for unfair or deceptive trade practices, Mass. Gen. Laws 93A §9(3) requires a claimant serve the respondent with a demand letter "describing the unfair or deceptive act or practice relied upon and the injury suffered[.]" Mass. Gen. Laws 93A §9(3). Under the statute, "[t]he demand requirements . . . shall not apply . . . if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth[.]" *Id.* In this case, Plaintiff served a demand letter upon Defendants, which was not required because Defendants do not maintain a place of business in Massachusetts. *See Moronta v. Nationstar Mortg., LLC*, 476 Mass. 1013, 1015, 64 N.E.3d 1287, 1290 (2016) ("[T]he provision clearly excuses [a] plaintiff from serving a demand letter if the prospective respondent [] lacks a place of business in Massachusetts[.]").

Although Massachusetts common law offers "no static definition of the term 'deceptive,'" courts have found a practice is "deceptive" for purposes of Chapter 93A "when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." *Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 394, 396, 813 N.E.2d 476, 486, 488 (2004).

It is well established that a breach of contract alone cannot constitute an unfair or deceptive trade practice for Chapter 93A purposes. *See, e.g., Geis v. Nestle Waters N. Am., Inc.*, 321 F. Supp. 3d 230, 245 (D. Mass. 2018) ("[A] mere breach of contract is not an unfair or deceptive act or practice.") (citing cases). However, a breach of contract which is "knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party[,]" *City of Revere v. Bos./Logan Airport Assocs., LLC*, 416 F. Supp. 2d 200, 209 (D. Mass. 2005) (quoting *NASCO, Inc. v. Pub. Storage, Inc.*, 29 F.3d 28, 34 (1st Cir. 1994)), or "has an extortionate quality that gives it the rancid flavor of unfairness[,]" *Whitman & Co. v. Longview Partners (Guernsey) Ltd.*, 2015 WL 4467064, at *9 (D. Mass. July 20, 2015) (internal quotation marks and citations omitted), can constitute an unfair or deceptive trade practice for a Chapter 93A action.

In the FAC, Plaintiff does not assert that the Illustration or Policy contained any steering language that induced her to obtain the Policy and deposit her Accumulated Value into one Index rather than another. She similarly does not claim that she was coerced into purchasing the Policy rather than obtaining different insurance from a different company. She also does not contend that Defendants benefitted more from her selection of the Pacesetter Index as opposed to other available Indices. Against this backdrop, the Illustration sent to Plaintiff after the Policy was issued cannot plausibly be alleged to have caused her to "act differently from the way [she] otherwise would have acted[.]" *Aspinall*, 442 Mass. at 396, 813 N.E.2d at 488.

For the foregoing reasons, Plaintiff does not state a plausible claim for unfair or

deceptive trade practices under Chapter 93A,[6] and the claim is DISMISSED.

### E.    Whether Plaintiff's Violation of RICO 18 U.S.C. § 1962(c) Claim Should Be Dismissed (Count III).

Plaintiff alleges that "[i]n violation of 18 U.S.C. §1962(c), Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the [e]nterprise through a 'pattern of racketeering activity,' as defined by 18 U.S.C. §1961(5)." (Doc. 31 at 41-42, ¶ 182.) "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (internal quotation marks omitted) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). "To establish a violation of § 1962(c), in turn, a plaintiff must show that a person engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Id.* (quoting *DeFalco*, 244 F.3d at 306). Defendants contend that the FAC fails to plausibly plead the requisite elements of an enterprise, a pattern of racketeering activity, and causation. The court agrees.

### 1.    Whether Plaintiff Plausibly Pleads an Enterprise.

In the FAC, Plaintiff alleges that the IMOs, who market the Policies; BGAs, who "provide back-office support for independent agents"; and independent agents, who sell the Policies ("Sales Channel Persons"), are the RICO enterprise members along with Defendants. (Doc. 31 at 4, ¶ 14.) Plaintiff asserts that "[t]he [e]nterprise is directed by Defendants, who (1) create the Policies, create and disseminate all Illustrations used to sell the Policies, (2) require that the Sales Channel Persons strictly comply with the fraudulent scheme concerning the sale of [P]olicies[,] and (3) collect the proceeds of the [e]nterprise." *Id.* at 27, ¶ 117.

---

[6] Defendants argue that Plaintiff must plead her Chapter 93A claim with particularity because her "allegations sound in fraud[.]" (Doc. 33 at 33) (citation omitted). The court need not determine this issue for purposes of ruling on Defendants' motion to dismiss because Plaintiff fails to satisfy the lesser plausibility pleading standard.

A RICO enterprise is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). "To allege such an association, 'a plaintiff must demonstrate the relationships between the various members and their roles in the purported RICO scheme.'" *Black v. Ganieva*, 619 F. Supp. 3d 309, 334 (S.D.N.Y. 2022), *aff'd*, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) (quoting *New York v. United Parcel Serv., Inc.*, 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016)). "Such an enterprise need not be a formal corporation, group[,] or organization. Instead, the statute is satisfied by a showing of a formal or informal group of persons, 'associated for a common purpose of engaging in a course of conduct' which then functions as a 'continuing unit.'" *Ferri v. Berkowitz*, 678 F. Supp. 2d 66, 73 (E.D.N.Y. 2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). To establish a group of persons is associated for a common purpose, a plaintiff must demonstrate "interpersonal relationships and a common interest." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (citations omitted). The Second Circuit has recently clarified that "RICO covers 'both legitimate and illegitimate enterprises.'" *United States v. Kelly*, 609 F. Supp. 3d 85, 125 (E.D.N.Y. 2022), *aff'd*, 128 F.4th 387 (2d Cir. 2025) (quoting *Turkette*, 452 U.S. at 580-81).

Plaintiff alleges that Defendants and certain unnamed Sales Channel Persons engaged in coordinated conduct for the purpose of selling Policies as their common interest. For the interpersonal relationship requirement, "a plaintiff must demonstrate the relationships between the various members and their roles in the purported RICO scheme." *United Parcel Serv., Inc.*, 2016 WL 4203547, at *3 (citations omitted). A plaintiff fails to plead interpersonal relationships when the complaint is devoid of facts connecting the enterprise members' actions. A conclusory statement will not suffice. *See Black*, 619 F. Supp. 3d at 334-35 (emphasis supplied) (finding plaintiff failed to plausibly plead interpersonal relationships when complaint made no statements about "*any* interpersonal relationship, agreement, collective action, or symbiosis between" the defendants); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010)

18

(finding plaintiff failed to plausibly plead interpersonal relationships because complaint did not allege how defendants knew each other or that they even knew each other); *Dynarex Corp. v. Farrah*, 2019 WL 2269838, at \*3 (S.D.N.Y. May 28, 2019) (finding plaintiff failed to plausibly plead interpersonal relationships between defendants because complaint's allegations were "entirely conclusory" and "there [were] no factual allegations suggesting [defendants] . . . were even aware of each other's existence").

    *Malek v. AXA Equitable Life Ins. Co.*, 2023 WL 2682408 (E.D.N.Y. Mar. 29, 2023), *appeal dismissed sub nom., Malek v. Feigenbaum*, 116 F.4th 118 (2d Cir. 2024), is instructive. There, a life insurance company moved to dismiss, in part, the plaintiff's RICO claim which alleged that the insurance company provided misleading information in order to "manipulate consumers into replacing their life insurance policies with risky, universal life insurance policies." *Id.* at \*2 (internal quotation marks and citation omitted). The *Malek* court dismissed the plaintiff's RICO claim because the complaint failed to plausibly allege the existence of an enterprise:

> The [c]omplaint does not contain factual allegations regarding any communications [the insurance company] had with any [broker], any particular incentives [the insurance company] provided to any [broker], or any concrete information at all regarding the nature of [the insurance company]'s relationship with any [broker]. The [c]omplaint also does not contain specific factual allegations as to the conduct of any [broker] . . . . Importantly, the [c]omplaint does not include any non-conclusory factual allegations that any [broker] was aware of [the insurance company]'s purported scheme or that any [broker] used the sales materials at issue in order to advance a common purpose with [the insurance company] (as opposed to, for example, advancing an individual self-interest). The [c]omplaint also is devoid of factual allegations regarding any relationship that the [brokers] had with one another – the [c]omplaint does not, for example, contain allegations that the [brokers] communicated with one another, coordinated with one another, or maintained interpersonal relationships with one another.

*Id.* at 15.

    In this case, with respect to each alleged enterprise member's role in selling the Policies, Plaintiff alleges that "Defendants partner with [IMOs] to market the Policies. IMOs recruit [BGAs] who provide back-office support for independent agents. The

independent agents, in turn, sell Policies to policyholders like Plaintiff." (Doc. 31 at 4, ¶ 14.) In the FAC, Plaintiff also alleges that "Sales Channel Persons market and sell the Policies throughout the United States as directed by Defendants." *Id.* at 27, ¶ 118; *see also id.* at 27-28, ¶ 119 (explaining the "hierarchical operating and decision-making structure" of the alleged enterprise). These allegations, however, merely describe the roles of participants in the process of insurance sales, not membership in a fraudulent scheme. The FAC does not identify a single communication between the alleged enterprise members, nor does it describe any specific actions in furtherance of the allegedly fraudulent scheme other than those attendant in the purchase and sale of insurance. An enterprise is not plausibly alleged in this manner.

For the foregoing reasons, Plaintiff does not plausibly allege the existence of an enterprise among Defendants and the Sales Channel Persons.

## 2. Whether Plaintiff Sufficiently Pleads a Pattern of Racketeering Activity.

To allege mail or wire fraud as predicate acts, a plaintiff must plead, "(i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (internal quotation marks and citations omitted). Defendants contend that Plaintiff fails to allege with sufficient particularity the first element, a scheme to defraud, which requires pleading, "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations[.]" *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (internal citations omitted).

Plaintiff must plead the circumstances surrounding the alleged scheme to defraud with particularity because Federal Rule of Civil Procedure 9(b) requires "a party [to] state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this requirement[,] the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz*

20

*Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). A plaintiff must allege sufficient facts to demonstrate "the time, place, speaker[,] and sometimes even the content of the alleged misrepresentation." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 579 (2d Cir. 2005) (internal quotation marks omitted).[7] The FAC falls far short of this mark.

"A 'scheme to defraud' is 'a plan to deprive a person of something of value by trick, deceit, chicane[,] or overreaching.'" *Williams*, 889 F.3d at 124 (citations omitted). "To make out such a scheme, a plaintiff must provide proof of a material misrepresentation." *Id.* (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)). A mail fraud scheme "requires some element of deception[,]" which "is satisfied where the mailing itself is misleading or where there is some other deception which the mailing serves." *McLaughlin v. Anderson*, 962 F.2d 187, 192-93 (2d Cir. 1992).

"Although scienter need not be alleged with great specificity, plaintiffs are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (citations omitted). "A common method of establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so." *O'Brien v. Price Waterhouse*, 740 F. Supp. 276, 280 (S.D.N.Y. 1990), *aff'd sub nom., O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674 (2d Cir. 1991) (internal quotation marks and citations omitted). A plaintiff can also plead fraudulent intent with allegations that "the defendant secretly intended not to perform [a contract] or knew that he could not perform." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)

In her FAC, Plaintiff identifies the sole speaker as LICS and the statements as made in the Illustration. She explains why she contends these statements were materially

---

[7] "But for the other elements of a RICO claim – such as non-fraud predicate acts or . . . the existence of an enterprise – a plaintiff's complaint need satisfy only the short and plain statement standard of Rule 8(a)." *Choi v. 37 Parsons Realty LLC*, 444 F. Supp. 3d 411, 419 (E.D.N.Y. 2020) (internal quotation marks omitted) (quoting *D. Penguin Bros. Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 666 (2d Cir. 2014) (alteration in original)). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

fraudulent; however, she does not plausibly allege that she was deceived by them, nor could she have been, because she entered into the Policy before the statements were made. Moreover, the FAC contains only one conclusory statement regarding Defendants' scienter: "At all relevant times, each associate in the [alleged e]nterprise was aware of the fraudulent scheme to sell the Policies, was a knowing and willing participant in the fraudulent scheme, and reaped profits therefrom." (Doc. 31 at 31, ¶ 135.) This conclusory statement does not give rise to a "strong inference" of the alleged enterprise's fraudulent intent. *Wexner*, 902 F.2d at 173 (citations omitted).

As Defendants point out, Plaintiff does not allege any motive on the part of Defendants to misrepresent the Indices because they have no incentive to steer a consumer to one Index versus another as "[t]here is, for instance, no pleaded monetary benefit to LICS." (Doc. 33 at 28.) In the FAC, Plaintiff concedes that the Defendants do not own the Indices and Plaintiffs had five indexed strategies from which to choose. She does not plausibly allege why Defendants would be motivated to fraudulently misrepresent only one of the five indexed strategies and to do so only after the Policy was issued. In the September 15, 2025 Hearing, Mr. Klein argued that Defendants were motivated to misrepresent the Indices because "[t]hey're getting somebody to pick a fund that belongs to them as opposed to perhaps a competitor[,]" (Doc. 41 at 42:4-5), but the FAC is bereft of facts supporting this claim.

For the foregoing reasons, Plaintiff does not plausibly plead that Defendants were engaged in a pattern of racketeering activity.

### 3.     Whether Plaintiff Plausibly Pleads Causation.

The last element of a RICO claim is causation. *Cruz*, 720 F.3d at 120. For causation, "a plaintiff must plausibly allege that the RICO violations were (1) 'the proximate cause of his [or her] injury, meaning there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct'; and that they were (2) 'the but-for (or transactional) cause of his injury, meaning that but for the RICO violation, he [or she] would not have been injured.'" *Alix v. McKinsey & Co.*, 23 F.4th 196, 203 (2d Cir. 2022) (quoting *UFCW Loc. 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir.

2010)).

In her opposition to Defendants' motion to dismiss, Plaintiff argues that, although she received the Illustration after selecting her Policy, she could have canceled the Policy within ten days of receiving the Illustration but declined to do so in reliance on the Illustration. She therefore claims that Defendants' alleged RICO violation caused her injury because "she was unable to meaningfully exercise her ten-day review and cancellation rights under the Policy." (Doc. 37 at 39.) The FAC, however, does not state that Plaintiff had the right to cancel the Policy within a ten-day review period, nor does it identify this alleged fact as part of her RICO claim. Attorney Klein conceded these omissions at the September 15, 2025 Hearing. *See* Doc. 41 at 33:13-19.[8]

Because Plaintiff does not plead causation and because "a complaint may not be amended by advocating a different theory of liability in an opposition brief wholly unsupported by factual allegations in the complaint[,]" *Palm Beach Mar. Museum, Inc. v. Hapoalim Sec. USA, Inc.*, 810 F. App'x 17, 20 (2d Cir. 2020) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)), Plaintiff's RICO claim must be DISMISSED.

## F.    Whether Plaintiff Should Be Granted Leave to Amend the FAC.

Plaintiff requests leave to amend the FAC to the extent that the court grants Defendants' motion to dismiss. Pursuant to Fed. R. Civ. P. 15(a)(2), courts "should freely give leave" to amend a complaint "when justice so requires." However, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

---

[8] The following discussion transpired at the September 15, 2025 Hearing:

> THE COURT: What's the causal connection between the seller's deception and the buyer's loss?
> MR. KLEIN: It goes back to the ten-day period we were discussing.
> THE COURT: Okay. Which isn't in the [FAC].
> MR. KLEIN: That period is not alleged in the [FAC].

(Doc. 41 at 33:13-19).

Defendants argue granting Plaintiff leave to amend would be futile because no additional allegations "would yield a viable claim for the reasons set forth [in their motion to dismiss]." (Doc. 38 at 15) (citation omitted). At the September 15, 2025 Hearing, Defendants' counsel, Timothy Perla, Esq., further argued that Plaintiff should not be granted leave to amend because "we've already done two full rounds of motion to dismiss briefing[.]" (Doc. 41 at 45:5-6.)

"Undue prejudice arises when an 'amendment comes on the eve of trial and would result in new problems of proof.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 192 (2d Cir. 2008) (alteration adopted) (quoting *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)); *see also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725-26 (2d Cir. 2010) ("Amendment may be prejudicial when . . . it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute.") (internal quotation marks and citation omitted). Discovery has not commenced in this case, and a trial date has not been set. With leave to amend, Plaintiff may be able to remedy at least some of the FAC's deficiencies. Therefore, granting leave to amend does not prejudice Defendants and is not futile.

For those reasons, Plaintiff is hereby GRANTED leave to amend and may submit a proposed Second Amended Complaint within twenty (20) days of the date of this Opinion and Order consistent with the Federal Rules of Civil Procedure and this court's Local Rules.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion to dismiss the FAC, (Doc 33), and GRANTS Plaintiff leave to amend.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _5th_ day of January, 2026.

Christina Reiss, Chief Judge
United States District Court